IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

_____
                                                )
ASHLEY L. RHODENIZER,                            )
                                                )
    **Plaintiff,**                                     )
                                                )
    **v.**                                            )     **CIVIL NO. 3:09CV306**
                                                )
CITY OF RICHMOND                                 )
POLICE DEPARTMENT,                               )
                                                )
    **Defendant.**                                    )
_____)

## MEMORANDUM OPINION

This matter is before the Court by consent of the parties pursuant to 28 U.S.C. §

636(c)(1) on the Defendant's motion for summary judgment (Docket No. 31).  For the reasons

set forth herein, the Defendant's motion is GRANTED.

### I. Background

This action is based upon allegations by the Plaintiff, Ashley L. Rhodenizer

("Rhodenizer"), formerly Ashley L. Farlow, that she was subjected to sex-based discrimination

while she was employed by the Defendant, the City of Richmond Police Department ("Police

Department").  Specifically, Rhodenizer alleges that she was subjected to a hostile work

environment and that she was retaliated against for pursuing a claim with the Equal Employment

Opportunity Commission ("EEOC"), alleging discrimination on the basis of her female gender.

The Police Department hired Rhodenizer as a police recruit on November 15, 2004.

(Rhodenizer Dep. 19:9-13, Sept. 8, 2009.)  Rhodenizer participated in the City's employee

orientation program and received copies of the City's Anti-Harassment Policy, as well as the

Police Department's separate Anti-Discrimination Policy. (Id. at 39:3-24; Def.'s Exhibits 3-9.) She then attended the Police Department's academy, where she received further anti-discrimination training. (Rhodenizer Dep. at 48:9-24.) She graduated from the academy in September 2005. On September 30, 2005, she was assigned to the midnight shift at a police station (the Fourth Precinct) under the supervision of Sergeant William Phibbs ("Phibbs"). (Id. at 28:5-13; 114:8-16; Def.'s Exhibit 14.) While employed by the Police Department, Rhodenizer was also successively supervised by Sergeants McCroy, Miles, Burke, McNamara, Barlow, and Brown. (Rhodenizer Dep. at 26:5-11.) Rhodenizer generally met the Department's expectations, was promoted twice, and received raises during the course of her employment with the Police Department. (Def.'s Exhibits 12, 13, 14; Rhodenizer Dep. at 237-38.)

The conduct giving rise to Rhodenizer's complaint allegedly occurred between July 2005 and May 2008. Rhodenizer filed a claim with the EEOC on December 12, 2007. (Def.'s Exhibit 27.) On April 25, 2008, she voluntarily resigned from the Police Department, effective May 9, 2008, having previously accepted employment with another local law enforcement department (the Chesterfield County, Virginia Police Department). (Def.'s Exhibit 38; Rhodenizer Dep. at 304:17-25.)

**The Conduct Giving Rise to Rhodenizer's Complaint**

**1. Conduct Involving Coworkers**

Rhodenizer's earliest alleged exposure to sex discrimination occurred in July 2005, while she was being fitted for her officer's uniform by a female quartermaster. (Def.'s Exhibit 28:8.) The quartermaster informed Rhodenizer that the uniform was not to show "curves or body," and she accordingly ordered size extra-large shirts and size ten ladies pants, even though Rhodenizer

wears a much smaller size (size four or six).  (Id.; Rhodenizer Dec. at ¶ 7.)  When Rhodenizer

received her uniform, it was "far too large."  (Id.; Rhodenizer Dep. at 131-33.)  Her classmates

and training instructor teased her, stating she looked like "Gomer Pyle."  (Rhodenizer Dec. at ¶

7.)  She admits, however, that her female classmates did not have similar problems with the size

of their uniforms.  (Rhodenizer Dep. at 133:2-12.)  In any event, Rhodenizer did not report the

incident or otherwise make complaint.  (Id. at 133: 13-15.)

Additionally, Plaintiff asserts that when she arrived at the Fourth Precinct, "some of the

older male police officers did not think a woman should be a police officer and would not even

speak to her."  (Def.'s Exhibit 28.)  She does not, however, identify any specific officer who

refused to speak to her for such a supposed reason.  Nor did she report such conduct.

(Rhodenizer Dep. at 125-26.)

## 2. Conduct Involving Sergeant Phibbs

Rhodenizer claims that Sergeant Phibbs harassed her from September 2005 to October

2006.  On several occasions, Rhodenizer alleges that Phibbs asked her about an ex-boyfriend,

how he was doing, and whether she had spoken with him.  (Def.'s Exhibit 35.)  Additionally,

Rhodenizer contends that Phibbs made inappropriate comments and jokes to her in the presence

of male officers, including "Would you two just get a room," "Take a number guys, she's

single," and "What? Are you going out with him now?"  (Id.)

On October 17, 2006, Rhodenizer reported Sergeant Phibb's conduct to his superior,

Lieutenant Ladin ("Ladin").  (Def.'s Exhibit 36.)  An internal investigation commenced that

same day.  (Id.)  Ladin listened to Rhodenizer's formal complaint, but then allegedly cautioned

her that Phibbs could lose his job if she pursued her complaint further.  (Rhodenizer Dep. at

163.)  He asked Rhodenizer what she wanted to do, and Rhodenizer responded that she did not

want Phibbs to lose his job.  (Id.)  Ladin then counseled Phibbs not to have any unprofessional

conversations with, or about Rhodenizer.  (Def.'s Exhibit 36.)  On October 21, 2006, Ladin

notified Phibbs of the same in writing.  (Id.)  Additionally, the Police Department responded

with anti-harassment training during the week of October 18, 2006.  (Rhodenizer Dep. at 54-56;

Def.'s Exhibit 36 at 7.)  Thereafter, Phibbs made no further comments to or about Rhodenizer.

(Rhodenizer Dep. at 161:13-21; 162:6-16.)

### 3.    Conduct Involving Sergeant Hood

Rhodenizer contends that Sergeant Hood ("Hood") harassed her from September 2006 to

December 2006.  Specifically, she asserts that during this time Sergeant Hood would call her on

her personal cell phone while off-duty four or more times per day.  (Def.'s Exhibit 28 at 10;

Rhodenizer Dep. at 160:9-25; 161:1-5.)  Hood also gave her gifts, including a gym bag, a Bible,

and flowers.  (Def.'s Exhibit 28 at 10; Rhodenizer Dep. at 173:4-12.)  Additionally, Rhodenizer

asserts that on or about December 6, 2006, Hood informed her that she was being informally

referred to the Richmond Employee Assistance Program ("REAP") for counseling.  (Rhodenizer

Dep. at 216:22-24; Rhodenizer Dec. at ¶ 51.)  Hood stated that she had to schedule an

appointment at REAP or face consequences, including suspension.  (Rhodenizer Dec. at ¶ 51.)

Nevertheless, none of Hood's alleged conduct was reported by Rhodenizer.  (Rhodenizer Dep. at

175:23-25; 176:1-4, 253:4-6, 271:18-22.)

### 4.    Conduct Involving Sergeant Barlow

Plaintiff alleges that Sergeant Barlow ("Barlow") harassed her on one occasion by

preventing her from riding in a car with one Officer Robert Jamison under an incorrect belief

that Rhodenizer and Officer Jamison had a personal relationship. (Def.'s Exhibit 28 at 11; Rhodenizer Dep. at 177-79.) Barlow explained to Rhodenizer, after-the-fact, that he did not want midnight and evening shift officers riding together. (Rhodenizer Dep. at 178-79.) Rhodenizer acknowledges that other male and female officers rode together. (Id. at 180:3-4.) In addition, on at least two occasions, Barlow allegedly told male police officers to let him know if Rhodenizer gave them "any problems." (Def.'s Exhibit 28 at 13; Rhodenizer Dep. at 193-94.) Rhodenizer did not personally hear any of these statements; rather, they were relayed to her by the male police officers allegedly involved. (Rhodenizer Dep. at 194.)

Rhodenizer further contends that on December 7, 2007, Barlow singled her out for discipline and did not discipline her male coworkers for similar conduct. (Rhodenizer Dec. at ¶ 75.) Specifically, on that day Rhodenizer, while operating a police cruiser, commented "in jest" over the police radio that the Department was playing "musical cars," referring to Barlow's car assignment procedures. (Def.'s Exhibit 33; Rhodenizer Dep. at 269-70.) Barlow responded on the radio, instructing Rhodenizer to "watch her radio etiquette." (Def.'s Exhibit 34.) Barlow also spoke to Rhodenizer later about the incident, but he did not seek to formally discipline her. (Id.) Rhodenizer asserts that male officers routinely joked on the radio and were not disciplined. (Gary Ladin Dep. 31:3-32, Sept. 11, 2009; Rhodenizer Dec. at ¶ 75.)

On January 5, 2008, Barlow asked Rhodenizer to remove a pink head-warmer while in uniform at the precinct. (Def.'s Exhibit 28 at 13; Def.'s Exhibit 37.) Rhodenizer recalls that other officers were sitting near her that day, wearing snow caps and other non-uniform apparel, and that they were not similarly directed to remove their headgear. (Def.'s Exhibit 28 at 13.)

### 5. Conduct Involving Sergeant McRoy

Rhodenizer alleges harassing conduct by Sergeant McRoy ("McRoy") that occurred between September 2006 and December 2006. Specifically, she asserts that on one occasion in which she entered the office wearing dress clothing, McRoy asked if she had been out drinking. (Rhodenizer Dep. at 143:13-17.) On another occasion, he stood very close to her during role call and commented on the shine of her boots and her overall appearance that he apparently found to be unacceptable. (Id. at 145.)

Finally, Rhodenizer asserts that after she suffered an on-the-job injury, McRoy refused to restore her official police powers when she was prepared to return to active duty. (Rhodenizer Dep. at 147-48.) She allegedly waited several weeks for the appropriate paperwork to be completed by him. (Rhodenizer Dec. at ¶ 47.) The Police Department ultimately restored the powers after Rhodenizer complained to a superior of McRoy's (Captain Segal). (Rhodenizer Dep. at 147-48.)

### 6. Conduct Involving Sergeant Brown

Rhodenizer contends that she was sexually harassed by Sergeant Brown ("Brown") on numerous occasions from August to October of 2007. On one occasion, after Rhodenizer had cursed about a copy machine malfunctioning, Brown called out of his office, "I hear profanity" and spoke with Rhodenizer about her statement. (Rhodenizer Dep. at 189:13-15; 190:1-3.) Rhodenizer asserts that cursing was common around the precinct, and that male officers were not similarly criticized. (Ladin Dep. at 29-30; Rhodenizer Dec. at ¶¶ 61-63.)

On another occasion, Brown asked Rhodenizer why she had a ring on her left finger if she was not married. (Def.'s Exhibit 28 at 23; Rhodenizer Dep. at 221:18-20.) Rhodenizer believed such an inquiry to be "stereotypically sexist," but she did not report it. (Rhodenizer

Dep. at 221:18-20; 223:2-5.)  Brown also asked Rhodenizer why she was working the midnight

shift when she should be home with her children, even though she does not have children.  (Id. at

224:3-6.)  She asserts that the statement constituted harassment as well, but she did not report it.

(Id. at 224:8-10.)

On several occasions, Brown telephoned other male police officers with whom

Rhodenizer was working and asked those officers whether Rhodenizer had done anything wrong

or "complaint worthy," "how the ride went," and whether Rhodenizer was a "hothead."  (Def.'s

Exhibit 28 at 27-28; Rhodenizer Dep. at 228:19-22, 230-31, 331-32.)  Rhodenizer admits that

she did not personally hear any of the statements; rather, they were repeated to her by the male

police officers who allegedly heard them directly.  (Rhodenizer Dep. at 228:23-25, 229:1-6, 331-

32.)

On September 1, 2007, Brown "cut off" Rhodenizer's backup while she was

investigating a suspect in an armed robbery that had occurred.  (Def.'s Exhibit 28 at 11;

Rhodenizer Dep. at 181:22-25.)  Rhodenizer reported the incident.  (Rhodenizer Dep. at 182:20-

25.)  After an internal investigation was conducted, it was determined that Brown's action was in

error, and he was counseled accordingly.  (Id.; Def.'s Exhibit 11.)

On September 2, 2007, Rhodenizer arrived for work feeling ill.  (Def.'s Exhibit 28 at 16.)

She asked Brown if she could work half of her shift and leave early after the busy hours of the

night.  (Id.)  Brown denied her request due to what he asserted to be a staffing shortage.  (Id.)

Rhodenizer commenced work, but left at 5:00 a.m., three hours before her shift was scheduled to

end.  (Id.)  Rhodenizer made a formal complaint about the incident.  (Id.)  Brown was counseled,

and Rhodenizer's leave request was ultimately approved by the Police Department.  (Id. at 16-

17; Rhodenizer Dep. at 78:22-25, 79:1-9, 81:1-3.)

On September 5, 2007, Rhodenizer asked Brown for leave time.  (Def.'s Exhibit 28 at 11-12; Rhodenizer Dep. at 184:11-14.)  Brown, who was reading something on his computer screen at the time, did not respond for what Rhodenizer believed to be a prolonged period of two to three minutes.  (Def.'s Exhibit 28 at 12; Rhodenizer Dep. at 184:11-14.)  Brown finally denied her request, explaining that only one officer was permitted leave per day, and that he did not know if anyone else had requested the same dates as had Rhodenizer.  (Def.'s Exhibit 28 at 12.) Rhodenizer asserts that, as a sergeant, Brown had access to all leave records and should have been able to approve her request immediately, but that he purposely did not do so and his actions were thereby discriminatory.  (Id.)  The Police Department ultimately approved Rhodenizer's request for leave.  (Rhodenizer Dep. at 186:17-25, 187:1, 188.)

On September 17, 2007, Brown ordered Rhodenizer, another female officer, and two male officers to step away from a citizen who wanted to make a complaint against Rhodenizer at the scene of a confrontation with the citizen.  (Def.'s Exhibit 28 at 19.)  None of the officers moved, including Rhodenizer, who remained in order to ask Brown to record the conversation, or to get a statement from the citizen.  (Rhodenizer Dep. at 210:10-25.)  After Brown ordered her to step back a second time, Rhodenizer placed her tape recorder on the roof of the car and walked away.  (Id. at 212-13.)  Later at the police station, Brown told Rhodenizer that if he ever had to ask her to do anything twice again, she would be charged with insubordination.  (Def.'s Exhibit 28 at 19.)  Rhodenizer does not believe that the other officers were ever confronted about the incident, even though they also refused the directive to step back.  (Id.)

On October 15, 2007, Rhodenizer requested overtime work, but Brown denied the

request on the basis that it would violate the Police Department's General Orders pertaining to a continuous work rule. (Def.'s Exhibit 28 at 18-19; Def.'s Exhibit 30.) Rhodenizer contends that, despite Brown's stated reasons for denying her request for overtime, he approved overtime work for five male officers in violation of the same supposed rule. (Def.'s Exhibit 28 at 18.) Rhodenizer challenged Brown's decision, and Brown's superiors (Lieutenants Loney and Drew) adjusted the work schedule so that Rhodenizer could receive overtime on several shifts (October 19, 20, and 23, 2007). (Def.'s Exhibit 31; Rhodenizer Dep. at 118-121.)

### 7. Conduct Involving Major McCoy

Rhodenizer asserts one allegation involving Major McCoy. After an email was sent to all police officers announcing a female defense tactics class, McCoy sent a reply-all email, asking, "Can I come watch?" (Def.'s Exhibit 28 at 9.) Rhodenizer asserts that the comment was indicative of a hostile environment.

### 8. Conduct Involving the Internal Affairs Division

Rhodenizer further asserts that she was discriminated against with respect to the resolution of several citizen complaints lodged against her. Specifically, she asserts that citizen complaints against her were not treated in the same manner as citizen complaints against male officers, even with regard to the same incident, the same citizen, and the same complaint. (Rhodenizer Dec. at ¶¶ 26-27.) For instance, with regard to complaint 2006-0060, the Internal Affairs Division ("IAD") card recording the disposition of the matter reads "No Further Action" concerning Rhodenizer, while the IAD card of a male officer who was also investigated reads "No improper action." (Def.'s Exhibit 16; Pl.'s Exhibit 7.) With regard to complaint 2006-0085, Rhodenizer's IAD card reads "Imp. Pol. Action" with the disposition "No Further Action,"

while male Officer Jamison's card reads "Improper Action" with a disposition of "No Improper Action." (Def.'s Exhibit 16; Pl.'s Exhibit 7.) For complaint 2008-0069, involving a complaint against Rhodenizer for "Excessive Force," a charge later changed to "Rudeness," her card noted the disposition of "Substantiated," but a male officer who was also listed in the complaint was noted as having been "Exonerated," and a second male officer who was also named in the complaint received no entry on his IAD card at all. (Def.'s Exhibit 16; Pl.'s Exhibit 7.)

Additionally, Rhodenizer notes that her IAD card has apparently been altered during the course of this litigation, implying that such spoilation is a crude attempt to mask the discriminatory animus involved in the underlying events. On the copy of her IAD card first produced in discovery, the disposition of complaint 2007-0178 was "whited out." (Pl.'s Exhibit 6.) However, on a later produced copy, there is the handwritten notation of "Informal No Further Action" over the "whited out" area. (Def.'s Exhibit 16.) With regard to complaint 2008-0069, the card first produced listed the subject complaint as "Excessive Force" and the disposition as "Substantiated," and on a later produced copy, "Excessive Force" was crossed off and "Rudeness" was hand written above the deletion. (Pl.'s Exhibit 6; Def.'s Exhibit 16.)

## II. Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. Id. at 255.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48 (emphasis in original). Indeed, summary judgment must be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of some "metaphysical doubt" concerning a material fact. Lewis v. City of Va. Beach Sheriff's Office, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). Of course, the Court cannot weigh the evidence or make credibility determinations in its summary judgment analysis. Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004).

Furthermore, a "material fact" is a fact that might affect the outcome of a party's case. Anderson, 477 U.S. at 247-48; JKC Holding Co. LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001).  A "genuine" issue concerning a "material" fact only arises when the evidence, when viewed in the light most favorable to the non-moving party, is sufficient to allow a reasonable jury to return a verdict in that party's favor.  <u>Anderson</u>, 477 U.S. at 248.

### III. Hostile Work Environment

Rhodenizer alleges that the Police Department discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII).  Title VII states that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-(2)(a)(1).  An employee's work environment is a term, condition, or privilege of employment.  <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 73 (1986).  Therefore, a cause of action may exist under Title VII if sexual harassment creates a hostile work environment.  <u>Id.</u>  In order to prevail on a hostile work environment claim, a plaintiff must prove that the offending conduct was: (1) based on sex; (2) unwelcome; (3) sufficiently severe or pervasive to create an abusive working environment; and (4) imputable to the employer.  <u>Smith v. First Union Nat'l Bank</u>, 202 F.3d 234, 241 (4th Cir. 2000).

**A.**     **Whether the conduct of Rhodenizer's supervisors and coworkers can be imputed to the Police Department.**

As noted, to succeed on a hostile environment claim against the Police Department under Title VII, Rhodenizer must prove that the allegedly harassing conduct is imputable to her employer, the Police Department.  <u>See</u> <u>Smith</u>, 202 F.3d at 241.  Where a plaintiff alleges sexual

12

harassment by a supervisor, the employer may be held vicariously liable.  Id.  However, if no tangible adverse employment action is taken, an employer may defend a claim of vicarious liability by showing: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Smith, 202 F.3d at 244 (citing Faragher v. City of Boca Raton, 542 U.S. 775 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)).  Additionally, where a plaintiff is harassed by coworkers, the employer may be held liable under a negligence theory if it knew, or should have known, about the harassment and failed to take effective action to address it.  Ocheltree v. Scollon Productions, Inc., 335 F.3d at 334.

**1.      The Conduct of her Supervisors**

With respect to the alleged conduct of Rhodenizer's supervisors, the Police Department has asserted the so-called Ellerth/Faragher defense.  In order to qualify for the defense, an employer must first establish that it did not take tangible employment action against the plaintiff. A tangible employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Ellerth, 542 U.S. at 761.  Here, the Police Department did not take any tangible employment action against Rhodenizer.  It did not fire her; rather, while she may have asserted in an "exit interview" that she was leaving for cause, she resigned to take another job and she does not allege that she was constructively discharged from the Police Department.  (Def.'s Exhibit 38; Rhodenizer Dep. at 304; Pl.'s Response at 18 ("Rhodenizer . . . agrees that she is not claiming constructive discharge in this action."))  She received every

promotion to which she was entitled. (Def.'s Exhibits 12, 13, 14; Rhodenizer Dep. at 237-38.) Moreover, although she was counseled several times by supervisors, she was never subjected to formal discipline as defined by the governing Personnel Rules of the City of Richmond.[1] (Pl.'s Response at 9; Rhodenizer Dec. at ¶ 18-19.)

There is no genuine issue of material fact as to whether the Police Department exercised reasonable care to prevent and promptly correct any sexually harassing behavior as concerns Rhodenizer. The Fourth Circuit has held that "[d]istribution of an anti-harassment policy provides 'compelling proof' that the company exercised reasonable care in preventing and promptly correcting sexual harassment." Barrett v. Applied Radiant Energy, 240 F.3d 262, 266 (4th Cir. 2001) (quoting Lissau v. Southern Food Serv., Inc., 159 F.3d 177 (4th Cir. 1998)). "The only way to rebut this proof is to show that the 'employer adopted or administered an anti-harassment policy in bad faith or that the policy was otherwise defective or dysfunctional.'" Id. (quoting Brown v. Perry, 184 F.3d 388, 396 (4th Cir. 1999)). It is undisputed that the Police Department and the City of Richmond each had coexisting, consistent anti-discrimination policies and that each provided anti-harassment training. (Def.'s Exhibits 5, 7-9.) Rhodenizer received a copy of both policies during her orientation and training. (Def.'s Exhibits 3-4, 6; Rhodenizer Dep. at 39.) Moreover, Rhodenizer does not, and cannot, argue that the Police Department's policy was administered in bad faith or was otherwise defective because when she availed herself of the policy with regard to the alleged conduct of Sergeants Phibbs and Brown,

_____

[1] Pursuant to the Personnel Rules of the City of Richmond, neither formal nor informal counseling is considered discipline, but a reprimand does constitute discipline. (Def.'s Exhibit 17.) Rhodenizer never received a reprimand. (Pl.'s Response at 9; Rhodenizer Dec. at ¶¶ 18-19.)

the Police Department responded immediately and the purported harassment ceased.

Nor is there any genuine issue of material fact but that Rhodenizer unreasonably failed to take advantage of the preventive and corrective opportunities provided by the Police Department and the City of Richmond with regard to any complaints she might have asserted. With regard to this element, "any evidence that the plaintiff failed to utilize the company's complaint procedure 'will normally suffice to satisfy [the company's] burden under the second element of the defense.'" Id. (quoting Lissau, 159 F.3d at 182). It is undisputed that, aside from reporting the conduct of Sergeants Phibbs and Brown, Rhodenizer did not report the conduct of any of the other supervisors who allegedly subjected her to a hostile work environment. (Rhodenizer Dep. at 57, 126-27, 133, 175-76, 217, 223-26, 253, 327.) Nor does she state a reason for her failure to do so. Given Rhodenizer's previous successful use of the procedures with regard to Sergeants Phibbs and Brown, and given her failure to proffer a viable excuse for her failure to utilize the procedures with regard to the conduct of the other supervisors, no reasonable fact finder could conclude that her failure to utilize the procedures was reasonable.

Because the Police Department has proven that: (1) it has taken no tangible adverse employment action against Rhodenizer; (2) it exercised reasonable care to prevent and promptly correct any sexually harassing behavior; and (3) Rhodenizer unreasonably failed to take advantage of any preventive or corrective opportunities provided by the Department, the Department cannot be found liable for the allegedly harassing conduct of Rhodenizer's supervisors, even if such conduct did, in fact, occur in creating a sexually hostile work environment.

## 2.    The Conduct of her Coworkers

With regard to any alleged conduct by Rhodenizer's coworkers, the Police Department can only be held liable if it was negligent in failing to take effective action to cease such harassing conduct of which it knew, or of which it should have known.  See Ocheltree, 335 F.3d at 334.  "Knowledge of workplace misconduct may be imputed to an employer by circumstantial evidence if the conduct is shown to be sufficiently pervasive or repetitive so that a reasonable employer, intent on complying with Title VII, would be aware of the conduct.  Spicer v. Commonwealth of Va., 66 F.3d 705, 710 (4th Cir. 1995.)  An employer may also be charged with constructive knowledge of coworker harassment if it fails to provide "reasonable procedures for victims to register complaints."  Ocheltree, 335 F.3d at 334.

Rhodenizer only alleges two incidents involving coworkers, and both occurred very early in her employment with the Police Department.  First, she alleges that she was given a uniform that did not properly fit her.  Second, she alleges that her male coworkers refused to speak to her when she first joined the Fourth Precinct because they thought a woman should not be a police officer.  Such conduct is simply not so pervasive or repetitive that the Police Department should be deemed to have had knowledge of it.  Rather, the conduct, if it occurred, was isolated and restricted to a brief period of time.  Such a conclusion is reinforced by the fact that the Police Department and the City of Richmond had existing procedures for addressing harassment; Rhodenizer was plainly aware of those procedures and had successfully used them in the past; and the Police Department had responded to each of her prior complaints promptly and effectively.  Therefore, the Police Department cannot found be liable for the conduct of Rhodenizer's coworkers pursuant to Title VII.

**B.**  **Whether the allegedly harassing conduct that was not reported to and addressed by the Defendant was based on gender and was sufficiently severe or pervasive.**

To prove a sexually hostile work environment in violation of Title VII, a plaintiff must also demonstrate that she was discriminated against because of her gender and that the harassment was sufficiently severe or pervasive so as to alter the terms and conditions of her employment in creating an abusive working environment. Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir. 2008). An employee is harassed "because of" her "sex" if, "but for" the employee's sex, she would not have been the victim of the discrimination. Smith, 202 F.3d at 242. "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003). A plaintiff "may prove sex-based discrimination in the workplace even though she is not subjected to sexual advances or propositions," but she can only succeed by showing that she "is the individual target of open hostility because of her sex." Ocheltree, 335 F.3d at 331. Accordingly, harassment due to personality conflicts is insufficient. Ziskie, 547 F.3d at 224.

In determining whether harassment is sufficiently severe or pervasive so as to alter the terms and conditions of a plaintiff's employment and create an abusive working environment, a court must examine all of the relevant circumstances, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993); Smith, 202 F.3d at 242. A sexual harassment claim has both a subjective and an objective component. Ziskie, 547 F.3d at 227. "The environment must be perceived by the victim as hostile or abusive, and that

perception must be reasonable."  Id. (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

The standard is designed to "filter out complaints attacking 'the ordinary tribulations of the

workplace, such as sporadic use of abusive language, gender-related jokes, and occasional

teasing," while at the same time protecting "working women from the kind of male attentions

that can make the workplace hellish for women."  Ocheltree, 335 F.3d at 333.

    Here, the incident involving the female quartermaster was an isolated incident involving

only Rhodenizer.  Rhodenizer admitted in her deposition testimony that none of her female

classmates had any problems with the fit of their uniforms as a result of the supposed policy such

that there is no evidence of gender-based animus in the quartermaster's alleged conduct.

(Rhodenizer Dep. at 133:2-12.)  Moreover, the "silent treatment" she allegedly received when

she commenced employment also appears to have been brief and isolated.  Moreover, to

conclude that such treatment was based on gender requires speculation where another possible

explanation for such conduct exists since Rhodenizer apparently arrived with a reputation of

being a "snitch."  (Rhodenizer Dep. at 141-42.)

    The conduct involving Sergeant Hood lasted for three months, during which time he

called her on her personal phone four or more times a day, and gave her gifts.  Although four or

more unwanted personal phone calls per day may be excessive and annoying, Rhodenizer

admitted that the nature of at least the gifts were "friendly."  (Def.'s Exhibit 28 at 10.)

Rhodenizer also does not assert that Hood's apparent flirting was a quid pro quo for anything

else.

    Rhodenizer has also not sufficiently demonstrated that there is evidence to create a

genuine issue of material fact that Sergeant Barlow's refusal to let her work directly with Officer

Jamison occurred because of gender-based animus. Sergeant Barlow had a legitimate, non-discriminatory reason for his refusal, namely, he did not want midnight and evening shift officers riding together. (Def.'s Exhibit 28 at 11; Rhodenizer Dep. at 177-79.) Moreover, Rhodenizer admitted that other male and female officers rode together. (Rhodenizer Dep. at 180.) The incident involving Sergeant Brown and the citizen complaint does not sufficiently suggest gender-based animus to create a material dispute as well, even though two male officers were not counseled, because Rhodenizer's conduct, at the same time, can be readily viewed as being insubordinate, and further, because another female officer who was also at the scene and declined the directive to move was not counseled. (Def.'s Exhibit 29 at 19.)

To conclude that the conduct of Sergeant McRoy was gender-based requires impermissible speculation. His comment about whether Rhodenizer had been "out drinking" was gender-neutral and obviously based on Rhodenizer's social attire at the time. Additionally, the facts surrounding his alleged refusal to restore her official powers following her absence does not reflect, alone, gender-based animus.

A few incidents alleged by Rhodenizer may suggest gender-based animus. Such incidents could include the "musical cars incident" and the "pink head warmer incident," both of which involved Barlow, as well as the incident in which Brown disapproved of Rhodenizer's use of profanity. Each reflects gender-related animus to the extent that male officers purportedly were not similarly counseled for similar conduct. However, those incidents also reflect what, at the same time, constitute insubordinate acts in violation of Department policy and procedure. As the Fourth Circuit has noted, the Court does not sit as a "super-personnel department weighing the prudence of employment decisions," such as when and when not to discipline. DeJarnette v.

Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998). While Brown commented on the ring on Rhodenizer's left hand and asked her why she was not home with her children, and McCoy asked if he could attend an all female defense tactics class to observe, such brief, isolated comments did not create an actionable, hostile environment. (Rhodenizer Dep. at 221, 224; Def.'s Exhibit 28 at 9.)

Rhodenizer argues that her case is comparable to that of the plaintiff in Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993). The Court finds the comparison to be unpersuasive. In Harris, the plaintiff alleged that the president of the company she worked at often insulted her and made her the target of sexual innuendos. Id. at 19. For instance, he said things like "You're a woman, what do you know," and called her "a dumb a** woman." Id. Once, he suggested that they go to a hotel and "negotiate" a raise. Id. He occasionally asked the plaintiff and other female employees to remove coins from his front pants pockets and threw objects on the ground, asking the women to retrieve them. Id. Such conduct is more plainly gender-based and humiliating than the conduct alleged by Rhodenizer here.

Viewing the conduct of Rhodenizer's coworkers and supervisors collectively, it was not sufficiently severe or pervasive to alter the terms and conditions of Rhodenizer's employment. Although some of the alleged conduct was offensive and/or boorish, none of it was particularly severe, physically threatening, or humiliating. Nor did the conduct occur with the frequency or pervasiveness necessary to create a genuine issue of disputed material fact sufficient to survive summary judgment. Additionally, as the Police Department notes, there was a nine month period from December 2006 to August 2007 during which Rhodenizer did not make any specific allegation. For all these reasons, and because the conduct cannot be imputed to the Police

Department in any event, the Department is entitled to summary judgment on Rhodenizer's

hostile environment claim.

## IV.  Retaliation

The Civil Rights Act also prohibits an employer from discriminating against an employee

because the employee "opposed any practice" made unlawful by Title VII or "made a charge,

testified, assisted, or participated in" a Title VII proceeding or investigation.  42 U.S.C. §

2000e-(3)(a).  To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1)

she engaged in a protected activity; (2) her employer took an adverse action against her; and (3)

a causal connection existed between the protected activity and the adverse action.  Matvia v.

Bald Head Island, 259 F.3d 26, 271 (4th Cir. 2001).  An adverse action need not be an ultimate

employment action, such as termination, that affects the terms and conditions of employment,

but it must be one that "a reasonable employee would have found . . . materially adverse,"

meaning that it would have "dissuaded a reasonable worker from making or supporting a charge

of discrimination."  Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006); see, e.g.,

Darveau v. Detecon, Inc., 515 F.3d 334 (4th Cir. 2008) (finding an adverse action where the

employer filed a lawsuit against the employee alleging fraud).  "Acts that carry 'a significant risk

of humiliation, damage to reputation, and a concomitant harm to future employment prospects'

may be considered adverse actions, although 'a mere inconvenience or an alteration of job

responsibilities' will not suffice."  Reinhardt v. Albuquerque Public Schools Bd. of Educ., ---

F.3d ---, 2010 WL 522328, at *4 (10th Cir. Feb. 16, 2010).  Nor do petty slights, minor

annoyances, and lack of good manners create such a deterrence.  Burlington N. & Santa Fe Ry.,

548 U.S. at 68.

Rhodenizer identifies only two incidents that she believes occurred in retaliation for her filing an EEOC charge. First, she asserts that Sergeant Barlow retaliated by speaking to her about wearing a pink head warmer while on duty, while not similarly addressing her male coworkers who were also wearing non-uniform apparel. The incident resulted in only an informal counsel (not a form of discipline under the Personnel Rules) for insubordination because Sergeant Barlow asked Rhodenizer twice to remove the headgear. No reasonable fact finder could conclude that Sergeant Barlow was motivated by retaliation for Rhodenizer having exercised her rights by pursuing her claims when he ordered Rhodenizer to remove the headgear, and only informally counseled her when she refused to do so in violation of his previous direction.

Rhodenizer also contends that the Police Department retaliated against her by reopening the investigation of a citizen complaint that had been lodged against her. Specifically, she states in a declaration attached to her motion that:

> 28. In regard to complaint 2007-0178, the incident occurred on September 17, 2007 and I received informal counseling from Lt. Drew, but Sgt. Brown had wanted more to be done. Apparently, nothing more was done regarding this complaint until after I filed my EEOC complaint. On January 29, 2008, I received an email from Lt. Drew in regard to information that she needed for a formal investigation of this complaint.
> . . . .
> 88. Shortly after I filed my EEOC charge, Lt. Drew told me that the incident on September 17, 2007 involving a rudeness complaint initiated by Sgt. Brown that she had previously counseled me on would now have to be investigated. In other words, this incident was investigated only because of the fact that I had filed an EEOC charge.
> 89. According to a memo later written by Sgt. Brown to Chief Monroe, this complaint was at one time considered "unfounded." The first IAD card provided in discovery shows the disposition as "whited out." After the complaint was investigated after my EEOC complaint, it was noted on another copy of my IAD card as "Informal No Further Action."

(Rhodenizer Dec. at ¶¶ 88-89.)

The institution or reopening of an IAD investigation, if proven, could constitute an adverse employment action because it would deter a reasonable worker from making or supporting a charge of discrimination for fear that the investigation could result in some form of punishment.  However, Rhodenizer has presented no evidence that the investigation was ever closed; rather, she merely speculates that it had been closed and reopened in response to her EEOC charge.  Moreover, the investigation did not result in any form of discipline being imposed against Rhodenizer.  As the IAD card reflects, "No Further Action" was necessary.

With regard to the third element, causation, Rhodenizer has failed to offer any evidence that the citizen complaint and the investigation thereof was not appropriate and based on non-discriminatory considerations.  The investigation concerned an incident in which Rhodenizer refused to step away from a citizen who wanted to lodge a complaint, despite a sergeant's order to do so, and when she ultimately complied following a second directive, she placed a tape recorder on the police car, an act that would reasonably intimidate a citizen who wanted to make a complaint and constitute an act of insubordination to a superior.  (Def.'s Exhibits 22, 23.)  As such, Rhodenizer has proffered no evidence sufficient to create a genuine dispute of material fact that would support an inference that an investigation of such a complaint was a pretext for retaliation against her for having pursued her rights before the EEOC.

Although Rhodenizer has satisfied the first element of a retaliation claim by establishing that she engaged in a protected activity in filing an EEOC charge, she has failed to present any genuine issue of disputed material fact from which a reasonable fact finder could also conclude that the Police Department took adverse action against her, or that it did so in retaliation for her

filing of the EEOC charge.  Accordingly, the Police Department's motion for summary judgment

is also granted with regard to Rhodenizer's retaliation claim.

## V. CONCLUSION

For the reasons discussed herein, Defendant's motion for summary judgment (Docket

No. 31) is GRANTED in its entirety.

An appropriate Order shall issue.

_____/s/_____

Dennis W. Dohnal
United States Magistrate Judge

Richmond, Virginia
Dated:  March 1, 2010